FILED

2019 NOV 26 PM 4: 41

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| EMILY GILBY; TEXAS DEMOCRATIC PARTY; DSCC; DCCC, | Civil Action |
| Plaintiffs, | Case No. 1:19-cv-01063 |
| v. | **FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| RUTH HUGHS, in her official capacity as the Texas Secretary of State, | |
| Defendant. | **First, Fourteenth, and Twenty-Sixth Amendments to the United States Constitution** |

Plaintiffs, EMILY GILBY, TEXAS DEMOCRATIC PARTY ("TDP"), DSCC, and DCCC, by and through their undersigned counsel, file this COMPLAINT for DECLARATORY and INJUNCTIVE RELIEF against Defendant RUTH HUGHS, in her official capacity as the Texas Secretary of State (the "Secretary"), and allege as follows:

**NATURE OF THE CASE**

1.     This litigation concerns changes to Texas's Election Code enacted by recently passed House Bill 1888. Among other things, House Bill 1888, which went into effect on September 1, 2019, amended Section 85.064 of Texas's Election Code to provide that early voting at any polling place in Texas must be available on the same weekdays as at the main early voting polling place for each county, and that any early voting polling place must remain open for at least eight hours each weekday it is open.[1] HB 1888 effectively bans "temporary" or "mobile" early

---

[1] Plaintiffs refer throughout this complaint to Section 85.064 of the Texas Election Code, as amended by House Bill 1888, as "HB 1888."

1

voting, which afforded county officials the discretion to open early voting locations with flexible hours and days, giving them the chance to bring early voting opportunities to as many voters as possible, including thousands of young Texans living on or near college or university campuses and without reliable access to transportation. Plaintiffs challenge these changes, which have already led and, if not enjoined, will continue to lead to substantially fewer early voting opportunities for young voters, as unconstitutional under the First, Fourteenth, and Twenty-Sixth Amendments.

2. Texas has long had problems with voter turnout. The state, for example, ranked last among all states for turnout in the 2014 midterm elections. Fernando Ramirez, *Voter Turnout in Texas is Dead Last in America, Study Finds*, Houston Chronicle (Sept. 19, 2018), https://www.houstonchronicle.com/news/houston-texas/texas/article/Voter-turnout-in-Texas-is-dead-last-in-America-13241845.php. The state's consistently low turnout is attributable in part to its restrictive voting laws, which include an early registration deadline, a lack of online voter registration, and a restrictive photo identification law. Elbert Wang, *Texas Saw the Nation's Sixth-Highest Voter Turnout Increase, But Still Lagged Behind Most Other States*, Texas Tribune (Dec. 7, 2018), https://www.texastribune.org/2018/12/07/texas-voter-turnout-sixth-highest-increase-2018-midterms/. Since the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), did away with preclearance under Section 5 of the Voting Rights Act, Texas has also closed more polling places than any state previously subject to preclearance, further depressing turnout. *See* Leadership Conference Education Fund, *Democracy Diverted: Polling Place Closures and the Right to Vote* (Sept. 2019), http://civilrightsdocs.info/pdf/reports/Democracy-Diverted.pdf.

3. Turnout in Texas improved dramatically in the 2018 midterm elections, however, largely thanks to the increased availability and use of early voting. That year, turnout increased by

2

18 percentage points compared with the previous midterms, which was the nation's sixth-highest increase. Wang, *supra*. Early voting played a significant role in this increase, accounting for over 70 percent of the total turnout in Texas. *Id.* In fact, the number of Texans who voted early in 2018 alone surpassed total turnout overall in the 2014 election. *Id.*

4.      One particular bright spot in the 2018 midterm elections was the significant use of early voting, and particularly temporary early voting, by young voters in Texas. Youth early voting rates rose by a whopping 508 percent statewide as compared with 2014. *See* Ana Orsini, *Voter Turnout of Young Adults Up 500 Percent in Texas*, KCBD (Nov. 2, 2018), https://www.kcbd.com/2018/11/03/voter-turnout-young-adults-up-percent-texas/. These included young voters at college campuses statewide making substantial use of temporary early voting locations offered on campus.

5.      HB 1888, which was passed on a largely party-line vote and signed into law by Governor Abbott on June 14, 2019, went into effect on September 1, 2019, and effectively bans temporary early voting by requiring that every early voting location operate for eight hours each weekday and stay open for the same number of weekdays as the main early voting location in the county.

6.      Counties throughout Texas do not have the financial resources to turn all of the locations where they offered temporary early voting into permanent early voting locations. As a result, several counties are offering significantly fewer early voting locations in the 2019 off-year elections than they did previously, and have indicated that they will also be forced to offer significantly reduced early voting opportunities in the upcoming 2020 elections. Many of the locations where early voting will no longer be available are on or near college campuses, and the impact of this reduction in early voting locations will almost certainly fall disproportionately on

young voters, who already suffer from limited automobile access compared to the general population. HB 1888 will make it more difficult, and in some cases impossible, for young voters throughout the state to exercise the franchise.

7.    In Tarrant County, for example, there will likely be no early voting locations on the campuses of the University of Texas at Arlington or at Texas Christian University in 2020, where temporary early voting locations previously existed. Bud Kennedy, *11,000 College Votes Turned Tarrant County Purple in 2018. Now Campus Voting May End*, Fort Worth Star Telegram (Sept. 28, 2019), https://amp.star-telegram.com/news/politics-government/article235524697.html.

8.    Austin Community College, which has self-funded all *nine* of its on-campus temporary early voting locations for years as a way of enshrining civic engagement as a part of its curriculum, is also likely to lose some if not all of its early voting locations. Michael Wines, *The Student Vote is Surging. So Are Efforts to Suppress It.*, The New York Times (Oct. 24, 2019), https://www.nytimes.com/2019/10/24/us/voting-college-suppression.html.

9.    At least six other on-campus early voting locations at colleges in Fort Worth, and two more in Brownsville, are also at risk. *Id.*

10.    Tens of thousands of young Texans have relied on these jeopardized on-campus early voting locations when casting their ballots in years past, including students who have limited access to transportation, first-time voters unsure of the process, and students who have jampacked and otherwise inflexible class and work schedules.

11.    Plaintiffs Emily Gilby, TDP, DCCC and DSCC, bring this lawsuit to protect their rights and the rights of their members and constituencies to equal opportunities and access to the franchise.

12.    HB 1888 discriminatorily limits equal access to early voting for a significant section of the Texas electorate. HB 1888 makes it more difficult, and in some cases impossible, for hundreds of thousands of Texas voters to participate in early voting in the communities in which they live and work, in violation of the First and Fourteenth Amendments. In addition, HB 1888 violates the Twenty-Sixth Amendment, which explicitly protects young voters against such restrictions on the franchise and guarantees them a substantive right to participate equally with other qualified voters in the electoral process.

## JURISDICTION AND VENUE

13.    Plaintiffs sue under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

14.    This Court has original jurisdiction over the subject of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

15.    This Court has personal jurisdiction over the Secretary, who is sued in her official capacity only.

16.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that caused Plaintiffs' claims occurred in this judicial district.

17.    This Court has the authority to enter a declaratory judgment and to provide injunctive relief under Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

18.    Plaintiff Emily Gilby is a resident of, and registered voter in, Williamson County, Texas. She is 22 years old and a junior at Southwestern University, where she also serves as the

current President of the Southwestern University College Democrats. In the November 2018 general election, which was the first time that Ms. Gilby voted in Texas, she cast her ballot at the temporary early voting location in Southwestern University's campus gym. Like Ms. Gilby, about half of all Southwestern University students cast their ballots at Southwestern University's on campus, temporary early voting location. Ms. Gilby's busy schedule is likely to make it difficult and burdensome to vote on Election Day, so she hopes to be able to vote early and on campus during the 2020 General election, like she did in November 2018. Unless HB 1888 is enjoined, Southwestern University will be unable to host a temporary early voting location, making it far more difficult for Ms. Gilby—or the roughly 50% of her classmates that also voted at the Southwestern University temporary early voting location in 2018—to cast her ballot. Thus, as a direct result of HB 1888's prohibition on temporary early voting locations, Ms. Gilby's right to vote will be burdened, both because she is being denied an equal opportunity to participate in early voting as compared to voters who do not live on or in close proximity to Southwestern University's campus, and because, upon information and belief, HB 1888 was passed with the intent to make it difficult for young voters, such as Ms. Gilby, to access early voting in Texas.

19.     Plaintiff TDP is the statewide organization representing Democratic candidates and voters throughout the State of Texas within the meaning of Section 117 of Texas's Election Code and all other applicable provisions of the election laws. TDP's purpose is to elect Democratic Party candidates to public office throughout Texas. To accomplish its purpose, TDP engages in vitally important activities, including supporting Democratic Party candidates in national, state, and local elections through fundraising and organizing efforts; protecting the legal rights of voters; and ensuring that all voters have a meaningful ability to cast ballots in Texas. TDP has millions of members and constituents from across Texas, including millions of Texans who are registered with

6

the Texas Department of State's Division of Elections as Democrats, and many other Texans who regularly support and vote for candidates affiliated with the Democratic Party.

20.     Plaintiff DSCC is the national senatorial committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14), and its mission is to elect candidates of the Democratic Party to the United States Senate, including in Texas. DSCC works to accomplish its mission across the country and in Texas by, among other things, making expenditures for, and contributions to, Democratic candidates for U.S. Senate and assisting state parties throughout the country, including in Texas. A top priority for DSCC is to engage young, Democratic voters and to foster in those voters a lifelong sense of civic engagement. In 2018, DSCC made contributions and expenditures in the tens of millions of dollars to persuade and mobilize voters to support Democratic Senate candidates.

21.     In 2020, DSCC expects to invest millions in support of the Democratic candidate selected as the nominee to run against Republican Senator John Coryn. HB 1888 directly harms DSCC by frustrating its mission of, and efforts in, electing the Democratic Party candidate to the U.S. Senate in Texas by suppressing the access of young voters, who tend to support Democratic Senatorial candidates, to the franchise. DSCC is aware of HB 1888 and will have to expend and divert additional funds and resources on GOTV, voter persuasion efforts, and other activities in Texas, at the expense of its efforts in other states, in order to combat the effects of HB 1888 in getting out the vote among Texas's young voters.

22.     Plaintiff DCCC is the national congressional committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14). DCCC's mission is electing Democratic candidates to the U.S. House of Representatives from congressional districts across the United States, including from Texas's 36 congressional districts. DCCC works to accomplish its mission across the country

and in Texas by, among other things, making expenditures for, and contributions to, Democratic candidates for U.S. Congress and assisting state parties throughout the country, including in Texas. A top priority for DCCC is to engage young, Democratic voters and to foster in those voters a lifelong sense of civic engagement. In 2018, DCCC made contributions and expenditures in the tens of millions of dollars to persuade and mobilize voters to support Democratic congressional candidates—several million dollars of which were spent for those purposes in Texas.

23.     For 2020, DCCC has identified at least eight congressional districts in Texas (Congressional Districts 7, 10, 21, 22, 23, 24, 31, and 32) as targeted races, in which it will expend resources to support the Democratic candidate. Overall, in 2020, DCCC expects to make contributions and expenditures in the millions of dollars to persuade and mobilize voters to support Democratic candidates in congressional elections around the country, including in Texas. HB 1888 directly harms DCCC by frustrating its mission of, and efforts in, electing Democratic Party candidates to the U.S. Congress in Texas by suppressing the access of young voters, who tend to tend to support Democratic Congressional candidates, to the franchise. DCCC is aware of HB 1888 and will have to expend and divert additional funds and resources on GOTV, voter persuasion efforts, and other activities in Texas, at the expense of its efforts in other states, in order to combat the effects of HB 1888 in getting out the vote among Texas's young voters.

24.     Defendant RUTH HUGHS (the "Secretary") is sued in her official capacity as the Secretary of State of Texas. The Secretary is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law in her official capacity. The Secretary's official responsibilities include serving as the Chief Election Officer for Texas, assisting county election officials and ensuring the uniform application and interpretation of election laws throughout Texas. *See* Tex.

Elec. Code § 31.001(a). As the head of the Elections Division of her office, the Secretary is charged with administering the Texas Election Code.

## STATEMENT OF FACTS AND LAW

### A. Young Voters And Early Voting

25.    Readily accessible early voting is critical for young voters. These voters are less likely than members of the general public to have easy and immediate access to reliable transportation, while having demanding and inflexible school and work schedules. Indeed, the percentage of 20 to 24-year-olds possessing driver's licenses has steadily decreased over the last 35 years, Michael Sivak & Brandon Schoettle, *Recent Decreases in the Proportion of Persons with a Driver's License Across All Age Groups* (Jan. 2016), http://www.umich.edu/~umtriswt/PDF/UMTRI-2016-4.pdf ("[T]here was a continuous decrease in the percentage of persons with a driver's license for the years examined. For example, the percentages for 20- to 24-year-olds in 1983, 2008, 2011, and 2014 were 91.8%, 82.0%, 79.7%, and 76.7%, respectively."), while the percentage for other age groups has remained significantly higher, *id.* ("[T]he percentages for 60- to 64-year-olds in 1983, 2008, 2011, and 2014 were 83.8%, 95.9%, 92.7%, and 92.1%, respectively."). Those young voters who do have driver's licenses often do not own vehicles, or the vehicles that they own are not easily accessible or reliable. Thus, young voters often must rely on public transportation or arrangements largely dictated by others to access early voting sites, making the distance to the nearest early voting site a particularly critical factor for equal access for this demographic.

26.    Younger voters (particularly first-time voters) also face information costs and are less likely to know where to vote, how Texas's voting process works, and the voting processes and facilities in their geographical area. Without the flexibility that temporary early voting on campus

9

or near to campus provides, many young voters would likely find it highly difficult—and, sometimes, impossible—to make it to the polls to cast their ballots.

27.     Limitations on accessible early voting also correlate with significantly longer lines and wait times for the voters able to make it to the polls. Young voters in Texas already often face long lines and wait times due to large populations of registered voters at their precincts, due in part to rampant polling place closures throughout Texas since *Shelby County*, *see supra* at ¶ 2, and due to the information deficits they face, which cause them to need more time to fill out ballots and navigate the voting process. When faced with a long line, some voters will be forced to forego voting, meaning these added burdens are likely to discourage many from attempting to vote. This is particularly true of young voters, who are more likely to be first time voters and thus more likely to be discouraged by these, and other, barriers to entry. *See* Eric Plutzer, *Becoming a Habitual Voter: Inertia, Resources, and Growth in Young Adulthood*, 96 Am. Pol. Sci. Rev. 41, 41-56 (2002) (noting that voter turnout rates increase with age due, in part, to a reduction in barriers to entry once voting becomes a habit and gains "inertia").

**B.** **Temporary Early Voting Locations and Results Prior to HB 1888**

28.     Prior to HB 1888, Texas administrators increasingly employed temporary early voting as an efficient, cost-effective way to reach populations, such as young voters, with particular transportation difficulties, and these efforts borne significant fruit. In Travis County, for example, more than 28,000 people voted at these sites in 2018, or nearly 6 percent of all the votes cast in Travis County. Michael Barajas, *The Death of Mobile Polling Places Could Shrink Early Voting in Texas*, Texas Observer (Aug. 30, 2019), https://www.texasobserver.org/the-death-of-mobile-polling-places-could-shrink-early-voting-in-texas/. Indeed, Dana DeBeauvoir, Travis County

clerk and chief elections official, called temporary voting sites dollar-for-dollar "the most effective program we had." Wines, *supra*.

29.     Young voters were among the populations best and most effectively served by temporary early voting locations. At Southwestern University in Georgetown, Texas, for example, more than half of the student population voted at the temporary voting site set up on campus. Wines, *supra*. And this was far from an anomaly. In Tarrant County, 11,000 voters voted at temporary early voting locations on campus in 2018. Kennedy, *supra*. Likewise, Cameron County opened three voting sites on college campuses in 2018, where 2,800 votes were cast. Wines, *supra*. These voters helped Texas's youth early voting in 2018 rise by 508 percent statewide as compared with 2014. *See* Orsini, *supra*.

30.     The results of this surge in Texas youth turnout in the November 2018 election are self-evident. Texas's young voters overwhelmingly supported the state's first competitive Democratic United States Senate candidate in decades.[2] Democrats, aided by the surge in youth turnout, also picked up two seats in Texas's congressional delegation, 12 seats in the Texas House, defeated two incumbent Republicans in the Texas Senate, and flipped the majorities of four Texas appellate courts.

**C. The Passage of HB 1888 and Its Harm**

31.     Following Democratic electoral success and the surge in youth turnout, Republican State Representative Greg Bonnen introduced HB 1888 on February 15, 2019. *See* Bill History:

---

[2] In 2018, the Democratic candidate for U.S. Senate lost to the Republican incumbent by a margin of only 2.56%, the narrowest margin in forty years. The margins of victory for prior senatorial elections were as follows: 27.2% (2014), 15.9% (2012), 12% (2008), 26.7% (2006), 12% (2002), 32.7% (2000), 11% (1996), and 22.5% (1994).

H.B. 1888, Legis. Sess. 86(R) (Tex. 2019), Texas Legislature Online, https://capitol.texas.gov/BillLookup/History.aspx?LegSess=86R&Bill=HB 1888.

32.    The purported purpose of the bill, as articulated by Republican State Senator Joan Huffman on the Senate floor, was to stop the practice of using temporary voting locations for electioneering, with Senator Huffman offering as an example local leaders placing temporary voting locations at schools for school bond elections, seeking to influence the vote. Danielle McLean, *Lawmakers in Texas Just Concocted a New Way to Keep Democratic Voters From the Ballot Box*, ThinkProgess (May 23, 2019) https://thinkprogress.org/texas-lawmakertexas-lawmakers-keep-democratic-voters-from-ballot-box-7cac16e8c5f6/.       State    Representative Bonnen, too, offered this justification when he initially introduced the bill, again relying on the example of school bond elections. Wines, *supra*.

33.    Opponents, however, pointed out that the bill would do far more than merely limit electioneering in school elections, including having many negative consequences. Chris Davis of the Texas Association of Election Administrators testified against the bill before the Texas House of Representatives Committee on Elections, noting that it would end many legitimate uses of temporary early voting locations by members of the organization, including preventing the placement of early voting locations in places where it would be critically important to have early voting, but where it did not make fiscal sense to locate an early voting location for the entirety of the two week early vote period. Texas House of Representatives, *March 11, 2019 Testimony Before the Committee on Elections*, http://tlchouse.granicus.com/MediaPlayer.php?view_id=44&clip_id= 16486.

34.    Seeking to address both concerns, Democratic representative John Bucy offered an amendment to the bill on May 7, 2019, which was meant to allow for the limited use of temporary

voting locations for primary and general elections for rural voters, nursing homes, and students at institutions of higher education. 86 H. Journal, Reg. Sess., 3109-3110 (Tex. 2019). As Representative Bucy described, his district "relies on mobile voting" and "[u]ses it for our most rural areas and for our colleges and our senior citizen homes." *Id.* Hence, Representative Bucy offered his amendment as "a compromise to make sure we're ensuring that those without vehicles and other mobility access could still have easy access to the ballot," *id.*, while still prohibiting the use of temporary voting locations in local elections to address the purported concerns of the bill's supporters.

35.     Representative Bucy's proposed amendment was tabled on May 7, 2019, *id.* at 3112, and then an amendment with the same language was finally defeated when Senator José Rodriguez offered it again prior to a vote on the bill on May 21, 2019.  86 S. Journal, Reg. Sess., 2405 (Tex. 2019). The bill subsequently passed on a largely party line vote, was signed into law by Governor Abbott on June 14, 2019, and went into effect on September 1, 2019.

36.     Upon information and belief, HB 1888 was passed for the purpose, at least in part, of reducing access to early voting for young Texas voters who reside on and near Texas's college and university campuses, many of which have hosted on-campus early voting sites, often at their own expense, *see supra* at ¶ 8, and where tens of thousands of young voters have cast their ballots in recent elections, *see supra* at ¶ 28. Despite the pretextual purposes offered by the bill's sponsors, HB 1888's true purpose was to make access to the franchise more difficult, especially for young, college and university student voters, in a direct attempt to suppress the historic youth early voting turnout that Texas saw in 2018 and would otherwise likely see in 2020.

37.     The bill has already produced, and will continue to produce, significant harm to young voters absent action from this court. Already, counties have been forced to offer

significantly fewer early voting locations in the 2019 off-year elections than they did in previous off-year elections, and have indicated that they will also be forced to offer significantly reduced early voting opportunities in the upcoming 2020 elections. In Travis County, for example, the county had 77 total early voting sites in 2017, when the law was not in effect, with 23 full time early voting sites and 54 locations where a mobile early voting site was located for at least one day of the early voting period. *See Early Voting Oct. 23 – Nov. 3*, The Austin Chronicle, October 20, 2017, https://www.austinchronicle.com/news/2017-10-20/early-voting/.     In the 2019 election, with the law in effect, the county has opened only 30 early voting locations in total. *See* Travis County Early Voting Locations for the November 5, 2019 General Election, https://countyclerk.traviscountytx. gov/polling-locations.html (last visited Oct. 29, 2019). Further, in Tarrant County, there will likely be no early voting locations on the campuses of the University of Texas at Arlington or at Texas Christian University in 2020, where temporary early vote locations previously existed. Kennedy, *supra*. Temporary early voting locations at Austin Community College and at college locations in Fort Worth and Brownsville are also likely to be closed for the upcoming 2020 election as a result of HB 1888. Wines, *supra*.

### CLAIMS FOR RELIEF

**COUNT I**
**Violation of First and Fourteenth Amendments:**
**Undue Burden on the Fundamental Right to Vote**
**U.S. Const. amends. I, XIV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202**

38.     Plaintiffs reallege and incorporate by reference all previous and subsequent paragraphs as though set forth herein.

39.     As the Supreme Court has recognized, "[i]t is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Indeed, the right to vote is the "fundamental political right . . . preservative of all

rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).

40.     Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, a court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the State for the burdens imposed by the rule. *See Burdick*, 504 U.S. at 434; *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

41.     "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (internal quotation marks omitted).

42.     HB 1888 leaves young voters in this state with less access to the franchise, despite the fact that their "information cost" to voting as inexperienced and often first-time voters is the highest. This burden is significant: it will undo any progress Texas has made against its abysmal youth turnout rates in 2018 by significantly diminishing the opportunities for young Texans to readily participate in what, for many, will be the first election in which they are eligible to vote.

43.     HB 1888 does not treat Texas voters equally regarding access to early voting. It mandates an inequality, because it disproportionately reduces or eliminates access to the franchise for Texas voters living or working on or near a college or university where on-campus temporary voting is no longer available, and where so many temporary voting locations had been placed, often at the college or university's own expense.

44.     Texas has no legitimate interest, let alone a weighty interest, in maintaining HB 1888's prohibition on temporary early voting locations— if it did, there was no reason to reject

proposed carveouts for colleges and universities (or nursing homes, for that matter), which were never cited as sites where the Legislature was concerned that school board bond electioneering occurred.

45.     Absent relief, Ms. Gilby, DSCC, DCCC, and TDP along with its members and constituents, particularly its young members who live on and near college and university campuses that previously hosted temporary early voting locations and have been banned from so doing under HB 1888, will continue to be subjected to an unjustified burden on their right to participate in Texas's elections.

## COUNT II
### Violation of Fourteenth Amendment: Disparate Treatment
### U.S. Const. amend. XIV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202

46.     Plaintiffs reallege and incorporate by reference all previous and subsequent paragraphs as though set forth herein.

47.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Put simply, "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

48.     Having adopted a system by which early voting is available, Texas may not "by later arbitrary and disparate treatment, value one person's vote over that of another." *Obama For Am. v. Husted*, 888 F. Supp. 2d 897, 910 (S.D. Ohio 2012), *aff'd*, 697 F.3d 423 (6th Cir. 2012); *Bush v. Gore*, 531 U.S. 98, 104–05 (2000) (holding Equal Protection Clause applies to "the manner of [the] exercise [of voting]" and "once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another").

49.     All Texas voters are similarly situated and should have equal access to early voting, which Texas law provides. Yet, under HB 1888, thousands of voters who were previously able to rely on and vote at temporary voting sites are treated differently. HB 1888 now mandates that, based on where they live, some voters will enjoy the same consistent access to early voting they had previously, but voters who live near now defunct temporary voting sites, especially young voters, will suffer reduced or eliminated access to the franchise. Because of HB 1888, many young, including newly-registered, first-time Texas voters who live on or near college and university campuses that once housed temporary voting locations will be denied an opportunity to equal access to early voting compared with those who live near permanent early voting locations.

50.     No legitimate state interest could justify HB 1888's burden, which creates arbitrary distinctions among Texas voters based on where they live and, relatedly, based on their age.

51.     Absent relief, Ms. Gilby, DSCC, DCCC, and TDP along with its members and constituents, particularly its young members who live on and near college and university campuses that previously hosted temporary early voting locations and have been prohibited from so doing under HB 1888, will be denied an equal opportunity to participate in Texas's elections.

### COUNT III
### Violation of Twenty-Sixth Amendment: Denial or Abridgement of the Right to Vote on Account of Age
### U.S. Const. amend. XXVI; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202

52.     Plaintiffs reallege and incorporate by reference all previous and subsequent paragraphs as though set forth herein.

53.     The Twenty-Sixth Amendment to the U.S. Constitution provides: "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on account of age." U.S. Const. amend. XXVI, § 1. Its goal "was not merely to empower voting by our youths but was affirmatively to encourage their voting, through

17

the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be brought within rather than remain outside lawfully constituted institutions." *Worden v. Mercer Cty. Bd. of Elections*, 294 A.2d 233, 243 (N.J. Sup. 1972). Thus, the Twenty-Sixth Amendment nullifies "onerous procedural requirements which effectively handicap exercise of the franchise . . . although the abstract right to vote may remain unrestricted." *Jolicoeur v. Mihaly*, 488 P.2d 1, 4 (Cal. 1971) (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939)).

54.     The Twenty-Sixth Amendment guarantees young, qualified voters a substantive right to participate equally with other qualified voters in the electoral process. Election laws, practices and procedures designed to deny or abridge the right to vote because of age are unconstitutional. While the amendment "speaks only to age discrimination, it has . . . particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) (citing 117 Cong. Rec. 5817, 5825).

55.     In direct contravention of the Twenty-Sixth Amendment, Texas enacted HB 1888 with the intent and effect of preventing newly-enfranchised young Texans from effectively exercising their right to vote.

56.     And HB 1888 will have the intended effect. Tens of thousands of young voters in Texas will face heightened burdens on their ability to cast their ballots in the 2020 General Election, mitigating much if not all of the increase in youth engagement that occurred in 2018, where young voters overwhelmingly chose to cast their ballots early, particularly at on-campus temporary voting locations.

57.     Absent relief, Ms. Gilby, DSCC, DCCC, and TDP along with its members and constituents, particularly its young members who live on and near college and university campuses

that previously hosted temporary early voting locations and have been banned from so doing under HB 1888, will continue to suffer the effects of intentional and unconstitutional discrimination because of age.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request this Court enter judgment:

(a) declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that HB 1888 violates the First, Fourteenth and Twenty-Sixth Amendments to the United States Constitution;

(b) permanently enjoining the Secretary of State, her respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to HB 1888 under the authority granted to this Court by Federal Rule of Civil Procedure 65(a) and 28 U.S.C. § 2202;

(c) awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action under 42 U.S.C. § 1988 and other applicable laws; and

(d) granting such other and further relief as the Court deems just and proper.

Dated: November 26, 2019.                    Respectfully submitted,

/s/ *John R. Hardin*
John Hardin
TX State Bar No. 24012784
PERKINS COIE LLP
500 N. Akard St., Suite 3300
Dallas, TX 75201
Telephone: (214) 965-7743
Facsimile: (214) 965-7793
JohnHardin@perkinscoie.com

Marc E. Elias*
John M. Geise*
Alexi M. Velez*
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959

19

melias@perkinscoie.com
jgeise@perkinscoie.com
avelez@perkinscoie.com

Kevin J. Hamilton*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
khamilton@perkinscoie.com

*Counsel for the Plaintiffs*

Chad W. Dunn
TX State Bar No. 24036507
Brazil & Dunn, LLP
4407 Bee Caves Road, Suite 111
Austin, Texas 78746
Telephone: (512) 717-9822
Facsimile: (512) 515-9355
chad@brazilanddunn.com

*Counsel for Plaintiff Texas Democratic Party*
*\*Admitted Pro Hac Vice*