**IN THE UNITED STATES DISTRIC COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

EMILY GILBY; TEXAS DEMOCRATIC
PARTY; DSCC; DCCC,

     *Plaintiffs*,

v.

RUTH HUGHS, in her official capacity as
the Texas Secretary of State,

     *Defendant*.

CIVIL ACTION NO. 1:19-cv-01063

**THE TEXAS SECRETARY OF STATE'S MOTION TO DISMISS**

Introduction ................................................................................................................1

Background ................................................................................................................2

Argument ..................................................................................................................2

   I.    The Secretary of State Is Not a Proper Defendant ....................................2

       A.    The Secretary Does Not Determine Voting Sites or Enforce HB 1888 ...........3

       B.    Plaintiffs Cannot Overcome Sovereign Immunity ...............................4

       C.    Plaintiffs Do Not Have Standing to Sue the Secretary ..........................5

   II.    Plaintiffs Lack Standing to Challenge HB 1888 ........................................7

       A.    Gilby Has Not Alleged an Injury in Fact .........................................7

       B.    The Committee Plaintiffs Lack Standing ..........................................9

       C.    The Committee Plaintiffs Lack Statutory Standing ..............................13

   III.   HB 1888 Is Constitutional .............................................................14

       A.    HB 1888 Makes Voting Easier and Does Not Burden the Right to Vote .........14

       B.    Plaintiffs' Equal Protection Claim Also Fails ...................................21

       C.    HB 1888 Does Not Violate the Twenty-Sixth Amendment .....................23

Conclusion ..............................................................................................................24

## INTRODUCTION

HB 1888 makes voting easier by directing local officials to keep polling places open for longer. It also prevents an abuse of the electoral system Texans had seen all too frequently: local officials picking and choosing their voters by strategically opening polling places for limited hours in shifting locations.

In any event, the Secretary of State plays no role in selecting polling places or implementing HB 1888. As the Fifth Circuit confirmed just last week, Plaintiffs cannot sue the Secretary for the decisions of local officials or challenge a statute she does not enforce. *City of Austin v. Paxton*, No. 18-50646, 2019 WL 6520769, at *6, — F.3d — (5th Cir. Dec. 4, 2019). Plaintiffs lack standing to do so, and sovereign immunity bars their claims.

Moreover, Plaintiffs lack standing to challenge HB 1888 regardless of who they sue. Their purported injuries are speculative, not certainly impending. Plaintiffs do not plausibly allege that any particular local officials will choose polling places inconvenient for Plaintiffs.

On the merits, HB 1888 is constitutional. It does not burden anyone's right to vote, and there is no constitutional right to early voting—let alone a right to vote at a particular location open for a particular time. HB 1888 protects the State's weighty interests in preventing gamesmanship by local officials, avoiding voter confusion, and increasing voter opportunities. HB 1888 also satisfies the Equal Protection Clause because it applies equally to everyone. Finally, HB 1888 does not violate the Twenty-Sixth Amendment because it does not deny or abridge anyone's right to vote on account of age.

The Texas Secretary of State respectfully requests that the Court dismiss Plaintiffs' claims for lack of subject-matter jurisdiction and failure to state a claim. *See* Fed. R. Civ. P. 12(b)(1), (6).

1

BACKGROUND

Texas legislators noticed a problem in Texas elections: "the selective harvesting of targeted votes" by local officials.[1]  Some local officials improperly sought "to influence the vote" by strategically establishing polling places in particular locations for limited times.  First Am. Compl. ("FAC") ¶ 32, ECF No. 19.

The Legislature remedied that problem by passing HB 1888.  It prevents local officials from engaging in selective vote harvesting by requiring early voting polling places to be open throughout the early voting period.  *See* Tex. Elec. Code § 85.064 (requiring "each temporary branch polling place" to be open "the days that voting is required to be conducted at the main early voting polling place" for, in most cases, at least eight hours per day).  Thus, the times and locations of early voting polling places will be clearer to all voters, not just those favored by certain local officials.

But that is not the only benefit of HB 1888.  It also prevents voter confusion by making polling places easier to find.  Now, when a voter sees an early voting polling place, he can be confident that polling place will still be there if he returns later.  Moreover, HB 1888 also increases opportunities to vote by increasing the amount of time that polling places remain open.

ARGUMENT

**I.     The Secretary of State Is Not a Proper Defendant**

Plaintiffs complain about the locations of voting sites.  But the Secretary does not determine those locations; local officials do.  Plaintiffs claim HB 1888 will affect the decisions local officials make.  But the Secretary does not enforce HB 1888.  Enforcement is instead through election contests filed by losing candidates.  And just last week, the Fifth Circuit confirmed that Plaintiffs cannot sue the Secretary for things she does not do. *Paxton*, 2019 WL 6520769, at *6.

---

[1] Statement of Rep. Bonnen to Elections Committee at 10:11–10:15 (Mar. 11, 2019), https://tlchouse.granicus.com/MediaPlayer.php?view_id=44&clip_id=16486.

### A.     The Secretary Does Not Determine Voting Sites or Enforce HB 1888

Under Texas law, local officials determine the location of voting sites.  *See* Tex. Elec. Code § 85.061 (providing that a county clerk's branch offices shall be permanent branch polling places unless the commissioners court otherwise provides); *id.* § 85.062(a) (providing that "one or more early voting polling places other than the main early voting polling place may be established by . . . the commissioners court" or "the governing body of the political subdivision").  Indeed, Plaintiffs concede as much.  *See* FAC ¶ 37 (discussing how "counties" determine "early voting locations").

Local officials also operate those voting sites.  *See* Tex. Elec. Code § 61.002.  Thus, they implement HB 1888 by ensuring those polling places are open at appropriate hours.  *See id.* § 85.064.  Local officials have independent legal obligations to comply with HB 1888, regardless of any action or inaction by the Secretary of State.

The Secretary does not supervise local officials' compliance with HB 1888, and she is not empowered to ensure or prevent such compliance.  To the extent local officials do not comply with HB 1888, their actions may be reviewable in an election contest.  *See* Tex. Elec. Code § 221.003(a) (requiring the tribunal "to ascertain whether the outcome of the contested election, as shown by the final canvass, is not the true outcome because . . . (2) an election officer . . . (C) engaged in other fraud or illegal conduct or made a mistake").  But that is a private cause of action brought by the losing candidate, not an enforcement action brought by the Secretary of State.  *See id.* § 232.002 ("Any candidate in an election may contest the election.").

Although the Election Code charges the Secretary of State with "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of this code," *id.* § 31.003, it does not provide her the power to coerce local officials.  Instead, it authorizes the Secretary of State to "assist and advise all election authorities with regard to the application, operation, and interpretation of this code."  *Id.* § 31.004(a).  Thus, the Secretary "maintain[s] an informational service for answering

3

inquiries of election authorities relating to the administration of the election laws or the performance of their duties." *Id.* § 31.004(b). The Secretary's other enforcement powers would not allow her to coerce a local official in a case like this. *See, e.g, id.* § 31.005.

In light of the Secretary's limited role under state law, Plaintiffs' claims suffer from two jurisdictional defects: (1) Plaintiffs cannot overcome sovereign immunity, and (2) they lack standing.

### B.  Plaintiffs Cannot Overcome Sovereign Immunity

Sovereign immunity bars Plaintiffs' claims. "[T]he principle of state-sovereign immunity generally precludes actions against state officers in their official capacities, subject to an established exception: the *Ex parte Young* doctrine." *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted). Thus, Plaintiffs' claims fail unless they fit the *Ex parte Young* exception.

*Ex parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation . . . ." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted). As a consequence, *Ex parte Young* applies only when the defendant enforces the challenged statute. *See Ex parte Young*, 209 U.S. 123, 157 (1908) ("In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party."); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) ("The required connection is not merely the general duty to see that the laws of the state are implemented, but the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." (quotations omitted)).

As the Fifth Circuit explained just last week, even when a government official "*has* the authority to enforce" a challenged statute, a plaintiff still must show the official "is likely to do [so]

here." *Paxton*, 2019 WL 6520769, at *6.  Without evidence of likely enforcement, the government official "lacks the requisite connection to the enforcement of" the challenged law.  *Id.* (quotations omitted).

This case follows a *fortiori* from *Paxton*.  As explained above, the Secretary *cannot* enforce HB 1888.  She does not enforce the law herself, nor does she control local officials' enforcement of it. She therefore necessarily lacks any connection to the challenged statute for purposes of *Ex parte Young*. Plaintiffs have not, and cannot, plausibly allege that the Secretary "is likely to" enforce HB 1888. *Paxton*, 2019 WL 6520769, at *6.

Even if the Secretary could control local officials' enforcement, a federal court could not order her to exercise such power.  Sovereign immunity forbids it.

The *Ex parte Young* exception is limited to prohibitory injunctions "prevent[ing] [a state official] from doing that which he has no legal right to do."  *Ex parte Young*, 209 U.S. at 159.  It does not authorize mandatory injunctions directing "affirmative action."  *Id.*; *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949) ("Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property.").  Thus, sovereign immunity bars "cases where the [defendant] sued could satisfy the court decree only by acting in an official capacity."  *Zapata v. Smith*, 437 F.2d 1024, 1026 (5th Cir. 1971) (Frankfurter, J., dissenting).  Even if the Secretary could control local officials, she could do so only in her official capacity, and sovereign immunity does not allow a suit to compel affirmative action by a state official.

## C.     Plaintiffs Do Not Have Standing to Sue the Secretary

Additionally, Plaintiffs cannot establish standing to sue the Secretary because her actions do

not cause their alleged injuries.  The locations of polling places depend on the decisions of local officials, not the Secretary of State.  Thus, Plaintiffs' asserted injuries—based on the alleged inconvenience of future polling places—are not "fairly traceable to the challenged action of the defendant"; they are "the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation and alterations omitted).

Plaintiffs' argument that HB 1888 will affect local officials' future decisions regarding future polling places is irrelevant.  To whatever extent that is true, *see infra* Part II, it means only that Plaintiffs can trace their purported injuries to *the statute*, not to *the Secretary*.  Whether HB 1888 causes Plaintiffs' injuries is irrelevant to whether Defendant causes their injuries.  *See Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) (dismissing for lack of standing and explaining that courts should not "confuse[] *the statute*'s immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the *defendants*"); *Paxton*, 2019 WL 6520769, at *14 (finding that it was "unlikely that the [plaintiff] had standing" to sue a state official who did not have the power to enforce the challenged statute).

For similar reasons, Plaintiffs' purported injuries are not redressable.  Relief against the Secretary would not accomplish anything.  Plaintiffs' requested injunction preventing "the Secretary of State . . . from implementing, enforcing, or giving any effect to HB 1888" would not meaningfully change the status quo. FAC 19.  The Secretary does not implement HB 1888 anyway.[2]

---

[2] That the Secretary is the "Chief Election Officer" is irrelevant.  FAC ¶ 24 (citing Tex. Elec. Code § 31.001(a)).  Although the Fifth Circuit once cited this statutory language in finding standing, *see OCA-Greater Hous. v. Tex.*, 867 F.3d 604, 613–14 (5th Cir. 2017), that case's reasoning does not apply when the challenged statute is enforced through a private cause of action.  In *Okpalobi*, the en banc Fifth Circuit found abortion doctors did not have standing to sue state officials regarding a law regulating their conduct because the law was enforced by a private cause of action, not by the state officials.  *See* 244 F.3d at 426–27.  But in *OCA-Greater Houston*, there was "no private right of action," so the court distinguished *Okpalobi*. *OCA-Greater Hous.*, 867 F.3d at 613.  Here, there is a private right of action, so *Okpalobi* controls.  HB 1888 regulates local officials, and it is enforced through an election contest brought by the losing candidate, not the Secretary.

Local officials, unaffected by the judgment in this case but bound by state law, would presumably continue to implement HB 1888, just as they do now.  Plaintiffs do not request an injunction ordering the Secretary of State to order local officials to disregard HB 1888, but even if they did, this Court could not grant it.  *See Okpalobi*, 244 F.3d at 427 (emphasizing "the elemental fact that a state official cannot be enjoined to act in any way that is beyond his authority to act in the first place").

When, "[f]or all practical purposes," any relief entered against the defendant would be "utterly meaningless," the plaintiff cannot establish redressability.  *Id.* at 426.  That is the case here.

As a result, this Court lacks jurisdiction over Plaintiffs' claims.  The Secretary does not enforce the challenged statute, and she cannot control the local officials who do.  That means Plaintiffs cannot overcome the State's sovereign immunity and lack standing.

## II.     Plaintiffs Lack Standing to Challenge HB 1888

Regardless of who they name as defendant, Plaintiffs lack Article III standing because they have not suffered cognizable injuries in fact.  In addition, Plaintiffs lack statutory standing because they cannot use Section 1983 to sue for alleged violations of third parties' rights.

### A.     Gilby Has Not Alleged an Injury in Fact

The only individual plaintiff in this case, Emily Gilby, claims to be injured because she may not be able to vote on campus in 2020.  Her concern is too speculative to support Article III standing.  But even if local officials will not put a polling place on campus, they may choose other locations equally convenient to Gilby.  Plaintiffs have not alleged to the contrary.

According to Plaintiffs, "Gilby's busy schedule is likely to make it difficult and burdensome to vote on Election Day, so she hopes to be able to vote early and on campus during the 2020 General election."  FAC ¶ 18.  This "hope" will be frustrated, she asserts, because her university "will be unable

to host a" polling place "[u]nless HB 1888 is enjoined." *Id.* The Complaint asserts that the lack of on-campus voting would "mak[e] it far more difficult for Ms. Gilby . . . to cast her ballot." *Id.*

Gilby has not plausibly alleged an injury in fact. HB 1888 sets the minimum number of hours that a polling place must remain open. That is, it prevents polling places from closing too quickly. On its face, HB 1888 makes voting easier, not harder. That is not an injury in fact.

Plaintiffs rely on the theory that HB 1888 effectively forces local officials to choose less convenient polling places. That is not true. Under HB 1888, local officials have the option of retaining their previous polling places. That is exactly what Dallas County is doing, according to an article cited in Plaintiffs' complaint. The local Elections Administrator decided "to spend the money needed to make pop-up voting sites on eight college campuses permanent."[3] For at least some voters, HB 1888 will not affect the locations of polling places at all.

Other local officials can follow Dallas's lead. Which local officials will retain their previous polling places is a matter of speculation, but another article Plaintiffs cited suggests that some will. A Tarrant County official "fe[lt] certain that" the county would "have an early-voting location" on the UT Arlington campus in 2020.[4] Plaintiffs suggests that such local decisions will turn on "the financial resources" available to counties and schools. FAC ¶ 6; *see also id.* ¶ 8 (alleging that one school "self-funded" its on-campus polling places). Of course, financial resources differ county to county and school to school.

Plaintiffs suggest some local officials may react to HB 1888 by having fewer polling places open for more time (rather than more polling places open for less time). *See* FAC ¶ 37 (alleging that

---

[3] Michael Wines, *The Student Vote Is Surging. So Are Efforts to Suppress It.*, NEW YORK TIMES (Oct. 24, 2019), https://nyti.ms/2MFBaFb, cited in FAC ¶¶ 8, 28–29, 32, 37.
[4] Bud Kennedy, *11,000 College Votes Turned Tarrant County Purple in 2018. Now Campus Voting May End.*, FORT WORTH   STAR-TELEGRAM   (Sept.   28,   2019),   https://amp.star-telegram.com/news/ politics-government/article235524697.html, cited in FAC ¶¶ 7, 29, 37.

Travis County increased the number of "full time early voting sites" while eliminating part time early voting sites in 2019).  Perhaps.  To the extent local officials pursue that path, whether any particular voter would be benefited or harmed is speculative.  In 2020, any given voter could have access to equally or more convenient polling places than he did in 2018.

The same is true for Gilby.  Williamson County officials could choose locations convenient for her.  Perhaps they will locate a polling place near Gilby's residence, her school, or her work. Plaintiffs do not allege otherwise.

Speculation about the decisions of local officials not before the Court cannot establish an injury in fact.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) ("[Plaintiffs'] theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending.").  Absent allegations establishing the locations of future polling places, any risk of future injury is "too speculative" to satisfy the "the imminence requirement," requiring dismissal to avoid "the possibility of deciding a case in which no injury would have occurred at all."  *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 537 (5th Cir. 2019) (quotation omitted).

### B.    The Committee Plaintiffs Lack Standing

The Committee Plaintiffs do not have either associational standing or organizational standing.

#### 1.    Associational Standing

The Committee Plaintiffs have not established associational standing.  A plaintiff cannot have associational standing unless one of its members would have standing to sue individually.  *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Ctr. for Biological Diversity*, 937 F.3d at 536. Thus, the Committee Plaintiffs must "identify members who have suffered the requisite harm" for injury in fact.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see also NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (requiring evidence of "a specific member").

Because the Committee Plaintiffs have not alleged the existence of specific members, let alone specific members with individual standing, their claims should be dismissed.  *See Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (holding that the Georgia Republican Party lacked associational standing because it "has failed to allege that a specific member will be injured by the rule, and it certainly offers no evidence to support such an allegation"); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (dismissing under Rule 12(b)(1) because plaintiff not identify a member who was affected by the challenged regulation).

At least some of the Committee Plaintiffs may not be able to allege that they have individual members at all.  The DSCC and the DCCC, for example, do not describe themselves as membership organizations.  FAC ¶¶ 20–23.  Not having members is fatal to associational standing.  *See Hunt*, 432 U.S. at 344 (requiring "indicia of membership in an organization" for associational standing); *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267–68 (D.C. Cir. 2002) (holding a city could not assert associational standing because it did not have members).

To be sure, the Committee Plaintiffs work on behalf of various candidates, but the beneficiaries of a plaintiff's services do not qualify as members for purposes of associational standing.  *See Ne. Ohio Coal. for Homeless v. Blackwell*, 467 F.3d 999, 1010 n.4 (6th Cir. 2006) ("[T]he Northeast Ohio Coalition for the Homeless apparently seeks to assert a form of representational standing never recognized by any court—standing on behalf of the group served by the organization."); *id.* at 1013 (McKeague, J., concurring) (rejecting associational standing based "on assertion of the interests of *nonmembers*," that is, the homeless people for whom the association "advocate[d]").

Plaintiffs have identified only one voter, Gilby, but they do not allege that she is currently a member of any of the Committee Plaintiffs.  *See* FAC ¶ 18.  She therefore cannot give them associational standing.  But even if she were a member, that would not help the Committee Plaintiffs because Gilby lacks standing for the reasons explained above.  *See supra* Part II.A.

## 2. Organizational Standing

The Committee Plaintiffs do not have organizational standing because they have not plausibly alleged that they, as organizations, will suffer injuries in fact. At minimum, they cannot allege cognizable injuries unless HB 1888 will affect the outcomes of individual races. But Plaintiffs do not allege that HB 1888 will be outcome determinative in any particular race.

An organization has standing to sue if it satisfies the same Article III requirements applicable to individuals: injury-in-fact, causation, and redressability. *See City of Kyle*, 626 F.3d at 237 (citing *Lujan*, 504 U.S. at 560–61). "[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to" conduct its routine "activities— with the consequent drain on the organization's resources." *Id.* at 238 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "Not every diversion of resources to counteract [a] defendant's conduct, however, establishes an injury in fact." *Id.* Rather, any "[s]uch injury must be 'concrete and demonstrable.'" *Id.*

Thus, to establish standing, "an organizational plaintiff must explain how the activities it undertakes in response to the defendant's conduct differ from its 'routine [] activities,'" and must "identify 'specific projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendant's conduct." *Def. Distributed v. U.S. Dep't of State*, No. 1:15-cv-372, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238).[5]

---

[5] *See also, e.g., ACORN v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999) (holding that organization's expenditures must be "caused by an[] action by" the defendant that the organization "claims is illegal, as opposed to part of the normal, day-to-day operations of the group" to confer standing) (citing *Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 78 & n.5 (3d Cir. 1998)); *Advocacy Ctr. v. La. Tech Univ.*, No. 18-cv-0934, 2019 WL 1303212, at *4 (W.D. La. Mar. 6, 2019) ("[A]lthough an organization conceivably could have standing if it incurred [] costs [], the organization still must show that it would not have incurred these costs in the absence of defendant's illegal conduct."), *report and recommendation adopted*, 2019 WL 1301983 (W.D. La. Mar. 21, 2019) (citing *ACORN v. Fowler*, 178 F.3d at 357–58).

Plaintiffs conspicuously fail to allege that HB 1888 will cause any Democratic candidate to lose a race he otherwise would have won.  Any such allegations would be implausible because Plaintiffs do not know how local officials will react to HB 1888, much less how voters would react to those reactions.  Plaintiffs leave the Court to speculate about whether any given candidate will lose his next election and whether HB 1888 would be the cause of such a loss.  *See Clapper*, 568 U.S. at 410–11.  Thus, any injury tied to losing an election is not "certainly impending."  *Id.* at 410.

True, some Plaintiffs allege that they expend resources "to combat the effects of HB 1888 in getting out the vote among Texas's young voters."  FAC ¶¶ 21, 23.  But Plaintiffs have not established that HB 1888's alleged effect on "getting out the vote among Texas's young voters" would qualify as a cognizable injury in fact.  Thus, Plaintiffs' efforts to avoid those alleged effects cannot count as an injury either.  Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Clapper*, 568 U.S. at 416; *see also supra* Part II.A.

But even if the Committee Plaintiffs could rely on their reaction to HB 1888, it still would not constitute an injury in fact.  First, Plaintiffs' alleged reaction is to support Democratic candidates for election, which is what they do anyway.  Thus, "Plaintiffs have not explained how the activities" they say HB 1888 leads them to undertake "differ from [their] routine [political] activities."  *City of Kyle*, 626 F.3d at 238.

Second, "Plaintiffs have not identified any specific projects that [they] had to put on hold or otherwise curtail in order to respond to" HB 1888.  *Id.*; *see also La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000) ("Karlson neither mentioned any specific projects ACORN had to put on hold while working on Lewis' case nor did he describe in any detail how ACORN had to re-double efforts in the community to combat discrimination.").  Vague references to "efforts in other states" do not suffice.  FAC ¶¶ 21, 23.

Thus, Plaintiffs have not plausibly pled Article III standing.  Their claims should be dismissed.

## C.    The Committee Plaintiffs Lack Statutory Standing

Even if the Committee Plaintiffs had Article III standing, they would still lack statutory standing.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) (explaining statutory standing).   Section 1983 provides a cause of action only when *the plaintiff* suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  It does not provide a cause of action to plaintiffs claiming an injury based on the violation of a *third party's* rights.  *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights."); David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45.

Thus, Section 1983 follows the general rule that a plaintiff "must assert [her] own legal rights and interests, and cannot rest [her] claim to relief on the legal rights or interests of third parties." *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)) (alterations in original).  When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory standing, regardless of Article III standing.  *Id.*; *see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999) (holding that a lawyer "clearly had no standing" to bring a § 1983 claim for an injury he suffered as a result of "the alleged infringement of the rights of his client" because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

Here, all of Plaintiffs' claims depend on the right to vote.  FAC ¶ 39 (basing Count I on "the right to vote"); FAC ¶ 48 (basing Count II on "the right to vote on equal terms"); FAC ¶ 55 (basing Count III on the "right to vote").  But the Committee Plaintiffs, as artificial entities, do not have voting rights.   "It goes without saying that political parties, although the principal players in the political process, do not have the right to vote."  *Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D.

Pa. 2002); *see also Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 91 (2d Cir. 2015) ("But Plaintiffs—five corporations and a not-for-profit trade organization—are not entitled to vote and have no right to equal representation in the legislature."). The Committee Plaintiffs are necessarily asserting the rights of third parties.

The Committee Plaintiffs therefore lack statutory standing to sue under Section 1983. Because this follows from the statute itself, Plaintiffs cannot invoke any exceptions related to prudential standing. *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) ("Because Congress specified in the statute who may sue, prudential standing principles do not apply.").

But even if the Committee Plaintiffs could invoke prudential-standing exceptions, their complaint does not do so. Plaintiffs do not allege that they have "a 'close' relationship with" voters, and there is no reason to think voters face any "hindrance" to protecting their "own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (noting the Supreme Court has generally "not looked favorably upon third-party standing").

## III.   HB 1888 Is Constitutional

Plaintiffs assert three claims: that HB 1888 (1) imposes an undue burden on the right to vote, FAC ¶¶ 38–45, (2) violates the Equal Protection Clause, *id.* ¶¶ 46–51, and (3) violates the Twenty-Sixth Amendment, *id.* ¶¶ 52–57. All three claims fail as a matter of law.

### A.   HB 1888 Makes Voting Easier and Does Not Burden the Right to Vote

Plaintiffs' right-to-vote claim fails for two independent reasons. First, HB 1888 does not infringe the right to vote at all. At most, it will affect one method of voting. Plaintiffs have no constitutional right to early voting in the locations they deem most convenient. Second, HB 1888 would easily pass constitutional muster under any standard of review because it makes voting easier and furthers weighty state interests.

1.      **The Constitution Allows States to Regulate Early Voting**

"The Constitution provides that States may prescribe '[t]he Times, Places and Manner of holding Elections for Senators and Representatives,' and the Court therefore has recognized that States retain the power to regulate their own elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting U.S. Const. art. I, § 4). "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Id.* (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

HB 1888 provides order for Texas elections.  By regulating the hours of polling places, HB 1888 prevents gamesmanship by local officials and provides voters with much-needed certainty.

Plaintiffs claim this modest regulation interferes with the "right to vote."  Not so.  The Supreme "Court has often noted that the Constitution does not confer the right of suffrage upon any one," and that "the right to vote, per se, is not a constitutionally protected right." *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982) (quotations and citations omitted).  Of course, if "a state or locality provides for election of its representatives, a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Angel v. City of Fairfield*, 793 F.2d 737, 740 (5th Cir. 1986) (quotation omitted); *see also McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969) ("[O]nce the States grant the franchise, they must not do so in a discriminatory manner.").

Thus, the Constitution does not include a freestanding right to vote in whatever manner Plaintiffs deem most convenient.  Considering a challenge to the limited availability of absentee ballots, the Supreme Court distinguished "the right to vote" from the "claimed right to receive absentee ballots." *McDonald*, 394 U.S. at 807.  The plaintiffs' inability to vote by mail did not implicate the right

15

to vote because it did not "preclude[] [the plaintiffs] from voting" via other methods. *Id.* at 808. Having disposed of the right-to-vote issue, the Court then considered whether the differential access to voting by mail violated the Equal Protection Clause. *See id.* Applying rational basis, the Court concluded it did not. *See id.* at 809.

So too here. Plaintiffs never allege that HB 1888 will actually prevent Gilby—or any other identifiable voter—from voting. Instead, they complain that HB 1888 will make it harder to vote early in person. As explained above, that is not what HB 1888 does. But even if it were, HB 1888 would remain constitutional. There is no constitutional right to early voting. To the extent individuals find in-person early voting inconvenient, they can vote on Election Day. And many voters are eligible to vote by mail. *See* Tex. Elec. Code §§ 82.001–.004. Plaintiffs do not allege any problems with those methods of voting.

Thus, HB 1888 does not prevent anyone from voting and does not implicate the right to vote. *See McDonald*, 394 U.S. at 807; *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 209 (2008) (Scalia, J., concurring in the judgment) ("That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required.").

The *Anderson-Burdick* test, on which Plaintiffs rely, FAC ¶¶ 39–40, applies only when a court "evaluate[s] a law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process." *Crawford*, 553 U.S. at 204 (Scalia, J., concurring in the judgment). That is because "[t]he right to vote derives from the right of association," as even the most expansive applications of the right to vote recognize. *Lubin v. Panish*, 415 U.S. 709, 721 n.* (1974) (Douglas, J., concurring) (quoting *Storer v. Brown*, 415 U.S. 724, 756 (1974) (Brennan, J., dissenting)).

The ability to vote for a particular candidate may implicate the right of association, *see Burdick*, 504 U.S. at 433, but HB 1888 does not. It is unlike the restrictive ballot-access laws in *Anderson* and

*Burdick*, which would have prevented supporters of certain candidates from voting for those candidates.  *Anderson v. Celebrezze*, 460 U.S. 780, 782–83 (1983); *Burdick*, 504 U.S. at 430.

Even if Southwestern University does not host an early voting polling place, Gilby—like every other voter—remains free to vote for the candidate of her choice at other locations (or perhaps through the mail).  Local officials' decisions regarding the locations of early voting polling places may make "casting a ballot easier for some," but they do not create "an absolute denial of the franchise." *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 n.6 (1969).  And if Gilby declines to take advantage of other methods of voting, the failure to vote is attributable to her alone.  *See Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973) ("[I]f [the plaintiffs'] plight can be characterized as disenfranchisement at all, it was not caused by [the challenged statute requiring enrollment], but by their own failure to take timely steps to effect their enrollment.").

Thus, the right to vote is not implicated here.  That alone is sufficient reason to dismiss Plaintiffs' right-to-vote claim and apply rational-basis review to their equal protection claim.  *See McDonald*, 394 U.S. at 807–09; *infra* Part III.B (addressing equal protection).

### 2.    In Any Event, HB 1888 Satisfies *Anderson-Burdick*

If the Court concludes the right to vote is implicated, HB 1888 should easily pass muster under *Anderson-Burdick*.  Any burden is *de minimis*, and the statute advances weighty State interests.

The first step of the analysis is to "weigh the character and magnitude of the asserted injury." *Burdick*, 504 U.S. at 434 (quotation omitted).  As discussed above, HB 1888 requires that polling places stay open for a minimum number of hours.  It prevents local officials from closing polling places early. Of course, keeping polling places open longer does not burden the right to vote.  It makes voting easier, not harder.

Plaintiffs do not argue that HB 1888 imposes any of the burdens traditionally considered under *Anderson-Burdick*.  It does not affect anyone's eligibility to vote.  It does not affect anyone's ability to

appear on the ballot.  Any voter can vote for any candidate.

HB 1888 does not affect Election Day voting.  Gilby alleges that her "busy schedule is likely to make it difficult and burdensome to vote on Election Day, so she hopes to be able to vote early and on campus."  FAC ¶ 18.  Of course, many people have a "busy schedule."  Gilby does not claim that voting on Election Day will be impossible, and her conclusory assertion that voting on election day "is likely to" be "difficult and burdensome" is not supported by any factual allegations.  But to the extent Election Day voting is difficult for Gilby, that has nothing to do with HB 1888.  No one disputes that HB 1888's regulation of early voting polling places does not apply to Election Day voting.  *See* Tex. Elec. Code § 85.064(b) (addressing "[e]arly voting by personal appearance").

Plaintiffs have not plausibly alleged a burden on early voting either.  Under Plaintiffs' theory, the most HB 1888 could do is lead local officials to choose different polling places going forward.  Plaintiffs' allegations provide no factual basis for determining which locations local officials might choose.  HB 1888 does not prohibit polling places from being located on university campuses or anywhere else.  Thus, whether relevant local officials will accept or reject Plaintiffs' preferred locations is unclear.  To the extent there is a burden on early voting at all, it is contingent on the unknown future decision of local officials.

Even if that contingency comes to pass—that is, local officials do not establish early voting polling places on campuses—the magnitude of the burden is likely to be quite small.  Local officials may put polling places very close to campuses or other places voters like Gilby congregate.

Plaintiffs do not allege any facts suggesting off-campus polling places would be materially inconvenient.  Plaintiffs seem to simply assume that voting anywhere off campus, even if it is just across the street, would be "far more difficult" than voting on campus.  FAC ¶ 18.  Plaintiffs do not allege any facts supporting such a counter-intuitive conclusion.

Because HB 1888 does not seriously burden the right to vote, it is subject to relaxed scrutiny. *See Burdick*, 504 U.S. at 434 ("[T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.").

HB 1888 survives any level of scrutiny. It furthers weighty State interests, including preventing gamesmanship, avoiding voter confusion, and increasing opportunities to vote. *See Crawford*, 553 U.S. at 191 (plurality) (requiring "relevant and legitimate state interests sufficiently weighty to justify the limitation" (quotation omitted)); *Burdick*, 504 U.S. at 433 (recognizing State interests in "fair an honest" elections characterized by "order, rather than chaos").

Preventing Gamesmanship: Texas has an interest in preventing inappropriate electioneering through the location of polling places. HB 1888 reduces the risk local officials will set up the polls at times and locations conducive to only certain segments of the population. Plaintiffs acknowledge that legislators expressed concern about past instances of gamesmanship by local officials. *See* FAC ¶ 32; House Elections Comm., Bill Analysis, Tex. H.B. 1888, 86th Leg. R.S. (2019), https://capitol.texas.gov/tlodocs/86R/analysis/pdf/HB01888H.pdf#navpanes=0 ("[C]oncerns have been raised about the possibility that some authorities accommodate certain voting populations to the exclusion of others. H.B. 1888 seeks to address this issue by revising the temporary branch polling place hours of operation.").

Of course, preventing gamesmanship is a weighty state interest. But preventing the appearance of gamesmanship is important too. By avoiding the appearance of impropriety, HB 1888 improves citizen trust in government.

Avoiding Voter Confusion: Texas also has an interest in preventing voter confusion. During early voting, a Texas voter can vote at any voting site in his county. Thus, if a voter sees an early voting location, he reasonably expects that, for the rest of the early-voting period, he can return to

that location to vote.  When a polling place closes or moves in the midst of early voting, it causes voter confusion.

Increasing Opportunities to Vote:  HB 1888 increases voter opportunity by requiring polling places to stay open longer.  On its face, HB 1888 makes voting easier by leaving the number of polling places alone but extending the hours those polling places are open.

Plaintiffs counter that local officials may respond to HB 1888 by decreasing the number of polling places.  HB 1888 does not require that, but even assuming some local officials will react that way, HB 1888 can still increase voter opportunities in those localities.  For example, Plaintiffs allege that Travis County, in the first election after HB 1888, increased the number of full-time early voting polling places from twenty-three to thirty.  FAC ¶ 37.  Plaintiffs complain about the elimination of fifty-four "mobile early voting site[s]."  *Id.*  But whether seven full-time polling places is better than fifty-four part-time polling places is a matter for state and local officials, not a federal court.  That said, a preference for the full-time polling places is certainly reasonable.  Because the part-time polling places were, by definition, open for fewer hours, the seven full-time polling places may have provided more hours of voting opportunities than the fifty-four part-time polling places did.

Plaintiffs suggest the Legislature should have approved a proposed amendment to HB 1888 that would have created "carveouts" for rural areas, nursing homes, and universities.  FAC ¶¶ 34–35, 44.  Such carveouts would have undermined the interests HB 1888 is meant to advance.  Gamesmanship can occur through strategic establishment of polling places in rural areas, nursing homes, and universities just as it can occur elsewhere.  As Rep. Greg Bonnen explained to the Elections Committee:  "While certainly bond elections in [school] districts have been really the most egregious example of this practice, it's not been isolated to those.  So I think it would be a little naïve

to think no such thing has ever happened in an urban county during a general election."[6]

The Legislature had good reason not to exempt the locations favored by Plaintiffs.  And of course, the State's interests in avoiding voter confusion and expanding opportunities to vote would have been undermined if the full-time requirement were not applied in those locations.  But even if HB 1888 were overinclusive, that would not cause it to fail *Anderson-Burdick* scrutiny.  "The fit between Texas's aims and the method used to obtain those aims need not be precise. Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by the state imperfect, it is nevertheless the rule that in a case like this perfection is by no means required." *Harris v. Hahn*, 827 F.3d 359, 369 (5th Cir. 2016) (quotations and brackets omitted).

For these reasons, HB 1888 does not violate anyone's right to vote.

### B.        Plaintiffs' Equal Protection Claim Also Fails

HB 1888 does not violate the Equal Protection Clause.  Plaintiffs have not plausibly alleged any invidious discrimination, and HB 1888 is supported by numerous rational bases.

HB 1888 applies equally to everyone.  It requires all early voting polling places to be open for a minimum number of hours, regardless of where they are located or who votes there.  By itself, the statute cannot provide any unequal advantage or disadvantage to anyone.  And Plaintiffs do not allege that anyone will enforce this facially neural statute in a discriminatory way.  *Cf. Washington v. Davis*, 426 U.S. 229, 241 (1976) ("A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race.").

Plaintiffs' theory seems to be that the local officials' reactions to HB 1888 will have a disparate impact on "voters who live near now defunct temporary voting sites, especially young voters."  FAC

---

[6] Statement of Rep. Greg Bonnen to Elections Committee at 22:16–22:33 (Mar. 11, 2019), https://tlchouse.granicus.com/MediaPlayer.php?view_id=44&clip_id=16486.

¶ 49; *see also id.* ¶ 6 (alleging "the impact . . . will almost certainly fall disproportionately on young voters"). For the reasons explained above, Plaintiffs' assertion is not plausible. Local officials have the option of locating full-time polling places at previous part-time sites, and at least some of them seem to have decided to do so. *See supra* Part II.A. Further, even if local officials choose different sites, they may be equally or more convenient for any given voter.

Had Plaintiffs plausibly alleged a disparate impact, that would not be sufficient. Disparate racial impacts, standing alone, do not violate the Constitution. *See Washington*, 426 U.S. at 242 ("[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another."). It follows that disparate impacts on "voters who live near now-defunct temporary voting sites" and "young voters" do not either.

Plaintiffs have not plausibly alleged discriminatory purpose. Plaintiffs included conclusory assertions, on "information and belief," of discriminatory intent. FAC ¶ 36 ("Upon information and belief, HB 1888 was passed for the purpose, at least in part, of reducing access to early voting for young Texas voters . . . ."). "These bare assertions . . . amount to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim, namely, that petitioners adopted a policy because of, not merely in spite of, its adverse effects upon an identifiable group. As such, the allegations are conclusory and not entitled to be assumed true." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (quotations and citations omitted)).

But even if Plaintiffs had plausibly alleged intentional discrimination, HB 1888 would still be subject to rational basis review:

> States may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest. The rationality commanded by the Equal Protection Clause does not require States to match age distinctions and the legitimate interests they serve with razorlike precision. As we have explained, when conducting rational basis review we will not overturn such government action unless the varying treatment of different groups or

persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the government's actions were irrational.

*Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83–84 (2000) (quotation and brackets omitted).

HB 1888 easily survives rational-basis review for the same reasons it survives under the *Anderson-Burdick* framework. *See supra* Part III.A.2.

### C.     HB 1888 Does Not Violate the Twenty-Sixth Amendment

The Twenty-Sixth Amendment has nothing to do with HB 1888.  It provides: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age."  U.S. Const. amend. XXVI, § 1.  It applies only when the right to vote is "denied or abridged" and when that denial or abridgement is "on account of age."  Plaintiffs cannot satisfy either requirement.

As explained above, HB 1888 does not burden the right to vote, much less deny or abridge it. *See supra* Part III.A.  Even if all of Plaintiffs' speculation about the future decision of local officials turned out to be true, their worst-case scenario is that some students would find voting less convenient, not that anyone would be prohibited from voting.  "Admittedly, allowing students to [vote on campus might] make it easier for them to vote, but it does not automatically follow that *not* allowing them to [do so] imposes a severe burden or otherwise abridges their right to vote."  *Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749, 757 (M.D. Tenn. 2015) (holding the inability to use a student ID card to vote did not violate the Twenty-Sixth Amendment).  There is no violation when, as here, voters can overcome any alleged burden simply by expending a "reasonable effort."  *One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 926 (W.D. Wis. 2016), *order enforced*, 351 F. Supp. 3d 1160 (W.D. Wis. 2019) (finding that Wisconsin's voter ID did not violate the Twenty-Sixth Amendment).

Nor does HB 1888 do anything "on account of age."  Any voter, regardless of age, can vote during the hours required by HB 1888.  That alone is sufficient to require dismissal of Plaintiffs' Twenty-Sixth Amendment claim.

For the reasons discussed above, Plaintiffs have not plausibly alleged a disparate impact on young voters.  *See surpa* Part III.B.  But even if they had, it would not suffice to state a Twenty-Sixth Amendment claim.  *See, e.g.*, *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 607 (4th Cir. 2016); *One Wisconsin Institute, Inc.*, 198 F. Supp. 3d at 926.

Nor have Plaintiffs plausibly alleged any discriminatory intent.  *See supra* Part III.B.

## CONCLUSION

The Secretary respectfully requests that the Court dismiss Plaintiffs' First Amended Complaint.

Date: December 10, 2019

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN
Associate Deputy for Special Litigation

JEFFREY C. MATEER
First Assistant Attorney General

TODD LAWRENCE DISHER
Deputy Chief, Special Litigation Unit

RYAN L. BANGERT
Deputy Attorney General for Legal Counsel

MATTHEW H. FREDERICK
Deputy Solicitor General

WILLIAM T. THOMPSON
Special Counsel for Civil Litigation

MICHAEL R. ABRAMS
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-076)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
todd.disher@oag.texas.gov
matthew.frederick@oag.texas.gov
will.thompson@oag.texas.gov
michael.abrams@oag.texas.gov

**COUNSEL FOR THE TEXAS SECRETARY OF
STATE**

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on December 10, 2019, and that all counsel of record were served by CM/ECF.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN